# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**CHARLES G. HATCHETT,**

        **Plaintiff,**

    **v.**                             **Case No. 10-C-265**

**JUDGE THOMAS BARLAND,[1] in his official capacity
as Chair of the Government Accountability
Board;
JUDGE GERALD NICHOL, in his official capacity
as Vice Chair of the Government Accountability
Board;
JUDGE MICHAEL BRENNAN, in his official capacity
as a member of the Government Accountability
Board;
JUDGE THOMAS CANE, in his official capacity
as a member of the Government Accountability
Board;
JUDGE DAVID DEININGER, in his official capacity
as a member of the Government Accountability
Board;
JUDGE TIMOTHY VOEKE, in his official capacity
as a member of the Government Accountability
Board;
and,
PHILLIP A. KOSS,
in his official capacity as District Attorney;**

                      **Defendants.**

---

[1]Hatchett named as Defendants, in their official capacity, six former judges who were members of the Wisconsin Government Accountability Board ("GAB"), an entity that has authority to investigation violations of Chapter 11 of the Wisconsin Statutes and to bring civil enforcement actions for such violations. *See* Wis. Stat. § 5.05(1). The GAB may refer matters to a District Attorney for criminal prosecution, *See* Wis. Stat. §§ 5.05(2m) and (2m)(c)(11), or under certain circumstances to to the Attorney General, *See* Wis. Stat. § 5.05(2m)(c)(16). The GAB, assumed responsibility in January 2008, and replaced the former State Elections Board and State Ethics Board. See http://gab.wi.gov (last visited Aug. 30, 2011); *See also*, 2007 Wisconsin Act 1.

    Defendants William Eich ("Eich") and Gordon Myse ("Myse"), who were named as Defendants, are no longer on the GAB, and Defendants Thomas Barland ("Barland") and Gerald Nichol("Nichol"), have assumed the positions of the GAB Chair and Vice Chair, respectively. *See* http://gab.wi.gov Additionally, David Deininger ("Deininger") and Timothy Vocke ("Voeke") are current members of the GAB. *Id.* The Court has amended the case caption to reflect those changes. *See* Fed. R. Civ. P. 25(b).

# DECISION AND ORDER

The Plaintiff, Charles G. Hatchett ("Hatchett"), a resident of Walworth County, Wisconsin, brings this civil action for declaratory and injunctive relief arising under the First and Fourteen Amendments to the United States Constitution. By this action, Hatchett challenges the constitutionality of the registration, record-keeping, reporting, and disclosure requirements imposed on individuals by Wisconsin's election law scheme contending that the challenged laws place severe burdens on core First Amendment-protected political speech and are not narrowly tailored to any compelling government interest. Specifically, he maintains that (1) Wis. Stat. § 11.23's political action committee ("PAC") style requirements are unconstitutional in the context of individuals participating in ballot measure advocacy, and (2) Wisconsin may not compel identification disclosures on the communications of individuals participating in ballot referendum advocacy as required by Wis. Stat. § 11.30 and Wis. Admin. Code [GAB] § 1.655.

As previously stated, Hatchett has sued the members of the GAB in their official capacities. Defendants Barland, Nichol, Judge Michael Brennan ("Brennan"), Judge Thomas Cane ("Cane"), Deininger, and Voeke, are currently members of that board. Defendant Phillip A. Koss ("Koss"), sued in his official capacity as the District Attorney of Walworth County, has independent enforcement authority. *See* Wis. Stat. § 11.60(4).

By a March 31, 2011, Decision and Order, the Court granted Hatchett's motion for a preliminary injunction enjoining the Defendants from enforcing §§ 11.23 and 11.30, Wis. Stats., against Hatchett in relation to his advocacy regarding the April 6, 2010, referendum in the town of Whitewater. In granting the preliminary injunction, the Court found that Hatchett is likely to succeed on the merits, as illustrated by Judge J.P.

- 2 -

Stadtmueller's ruling in *Swaffer v. Cane*, 610 F. Supp. 2d 962, 969-70 (E.D. Wis. 2009), finding §§ 11.23 and 11.30, Wis. Stats., unconstitutional as-applied to plaintiff John Swaffer use of postcards and yardsigns in opposition to referendum regarding liquor sales in Whitewater, Wisconsin, and plaintiff Michael Rasmussen's efforts to contribute to that activity.

This action is before the Court on the parties' cross motions for summary judgment. The motions are ready for resolution and are addressed herein.

### STANDARDS APPLICABLE TO SUMMARY JUDGMENT

In considering a motion for summary judgment, the Court applies the following standards. Judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *See also*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). A party "opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248; also citing *Celotex Corp.*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *United States v. Rode Corp.*, 996 F.2d 174, 178 (7th Cir. 1993)).

"Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a

- 3 -

matter of law – is upon the movant.  In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587.

## FACTUAL BACKGROUND

Hatchett is an individual who resides in Walworth County, Wisconsin.  When Hatchett moved to the Whitewater area in 1977, the town was "dry."  A short time later, however, the Whitewater town board issued two liquor licenses for locations within the town of Whitewater ("Whitewater").  Chairman Charlie Cruse ("Cruse"), who was the town chairperson at the time, stated that Whitewater had the right to issue licenses because Whitewater's  records had been destroyed in a fire so there were no ordinances prohibiting it from doing so.  The board did not post public notices or conduct hearings, it simply issued the licenses.

When word got out, Whitewater residents reacted strongly.  They hired an attorney, got the licenses rescinded, and placed a referendum on the ballot at the next election that Whitewater should be free from liquor sales. The voters approved the referendum overwhelmingly, and Whitewater continued to be completely "dry" until 2008, when two referendums were passed allowing the sale of wine only.  Class B liquor licenses for the sale of beer and hard liquor were still prohibited.

During the 2006 spring election, three referendums were added to the ballot to approve the sale of alcoholic beverages in Whitewater.  However, there was very little publicity about the referendums and few contested offices, so few electors knew about them and there was little incentive to turn out to vote.

- 4 -

On March 27, 2006, Scott Hatchett ("Scott"),[2] Hatchett's son, phoned Hatchett and told him that a Whitewater town board member told Scott that most Whitewater residents were not aware that the referendums were on the ballot. Hatchett was concerned about the referendums and believed that if he did not know about them, it was unlikely that others in the community knew about them.

Having decided to inform the community, Hatchett contacted the local advertising newsletter, "Good Morning," to see if it was possible to place an ad in the newsletter. He was told that there was insufficient time to do so before the election. As a result, Hatchett decided to send a mailing and called a local realtor to request a list of the town residents and their mailing addresses. He also called the Whitewater clerk asking for that information, but she was not available.

Hatchett eventually decided to send a postcard because it would be easier and less expensive than a letter. He wrote, photocopied, and mailed a simple postcard asking residents to vote "no" on the three referendums. Hatchett estimates that he purchased 524 stamps for the mailing. He personally paid all costs associated with the mailing including the cards, printing, and postage. He offered to pay the realtor for the residents' names and addresses, but the realtor declined.

Hatchett did not sign the card because of his long association with Joy Baptist Youth Camp ("Camp Joy"), a Christian youth camp on Whitewater Lake, where he had been the director until 2007. Hatchett sent the mailing as a private citizen, and did not want repercussions for the camp, which requires the Whitewater board's approval for construction and improvements to camp facilities. Hatchett believed it was his responsibility and duty as

---

[2]To distinguish between the Plaintiff and his son, the Court departs from its usual practice of referring to an individual by his or her surname, and refers to Hatchett's son by his given name. No disrespect should be inferred.

a citizen, town resident, and elector to inform the residents of the referendums and to encourage them to vote against them.

Hatchett felt strongly that the sale of alcohol in the town was not in the community's best interests and, for that reason, he urged his fellow citizens to vote "no." He was solely responsible for the postcard, and mailed it as a private citizen, believing his neighbors should be informed and that he was exercising his First Amendment rights and responsibilities.

The mailing was successful, and the referendums were defeated by a substantial margin. The day of the election, a sheriff's deputy visited Hatchett and asked him whether he was responsible for the postcard mailing. Hatchett was intimidated by the deputy and declined to answer.

Shortly after the incident, Scott told Hatchett that two plainclothes deputies came to Camp Joy. Scott informed Hatchett that, after the officers advised Scott that criminal charges were possible if Scott refused to cooperate, he told the officers that Hatchett was involved with the mailing. Until these law enforcement contacts, Hatchett was not aware of any law controlling whether he could contact his neighbors and town residents about a political matter.

Hatchett contacted attorneys who were able to convince the district attorney that Hatchett did not know about the law and did not intend to violate it. Eventually, the district attorney decided not to prosecute Hatchett for the mailing.

Around February 2008, Scott told Hatchett that the town chairman came to Camp Joy, where Scott was employed, and interrupted a staff meeting to tell Scott that referendums similar to those that Hatchett had opposed in 2006 would be on the ballot again

- 6 -

on April 1, 2008, and that they did not want any opposition. In 2008, Hatchett made no expenditures advocating for or against the referendums.

On May 27, 2009, the GAB sent a letter to its staff and all Wisconsin district attorneys directing them to refrain from enforcing the statutory provisions that are the subject of this litigation.

In 2010, Hatchett opposed an upcoming local Whitewater referendum on whether to permit the issuance of Class B liquor licenses and the sale of beer and hard liquor within the town limits, which had not been allowed since 1977. Hatchett posited that many Whitewater residents were unaware of the referendum and he wanted to distribute postcards by mail, and flyers by hand and mail. He determined that the postcards and flyers would state "Town of Whitewater residents, Vote NO on referendum to sell beer on Whitewater Lake, April 6. Help us keep our lake safe." (Compl. ¶ 8.) Hatchett felt that if Whitewater residents were made aware of the referendum, they would overwhelmingly defeat it.

Hatchett intended to make a "disbursement" as defined by Wis. Stat. § 11.01(7) of over $25, a statutory trigger in Wis. Stat. § 11.23, to print and distribute the postcards and the flyers, anticipating the total cost would be approximately $300. Hatchett did "not want to comply" with the statutory referenda reporting and disclosure requirements "because he believe[d] they violate[d] his First Amendment rights" (Compl. ¶¶ 11-12), and he feared that if he was forced to comply with the provisions, he would suffer intimidation and harassment as a result.

Hatchett feared retaliation if he included the disclosure on his postcards and flyers because the referendum was controversial in the Whitewater community and he believed that many of the referendum's supporters were particularly influential and powerful members of the community. Hatchett's concerns stem in part from his experience with

- 7 -

substantially similar activities in 2006 in regard to a Whitewater referendum on the same subject, and the controversy that ensued in 2008 in relation to a similar referendum. Hatchett also feared both civil and criminal prosecution if he produced and distributed the postcards and flyers without complying with the requirements of Wis. Stat. §§ 11.23 and 11.30, and would not send the mailer, or send or distribute the flyer without the grant of injunctive relief.

Hatchett filed this action on March 26, 2010, less than two weeks before the referendum. Hatchett sought a temporary restraining order ("TRO") preventing the Defendants from bringing suit against him for violating the Wisconsin election laws.

A year before in *Swaffer v. Deininger, et al.*, No. 08-CV-208, 2008 WL 5246167 (E.D. Wis. Dec. 17, 2008), counsel, who represented the plaintiffs in that action and currently represents Hatchett, had negotiated an agreement with the same Wisconsin assistant attorney general, Christopher J. Blythe ("Blythe"), that the same statutes would not be enforced. However, Hatchett's attorney proceeded with the TRO motion without contacting Blythe.

With the April 2010 referendum approaching, Hatchett wanted to send the mailer, and to send and begin distributing the flyer just over a week prior to the election. Hatchett considered that this was the most effective timing for his advocacy.

Before filing Hatchett's renewed motion for TRO and preliminary injunction, Hatchett's attorney contacted Blythe. By letter of March 31, 2010, Blythe advised the Court and opposing counsel that the Defendants would not prosecute the plaintiff "with respect to the facts and relevant statutes referenced in the complaint." (Letter dated March 31, 2010, from Blythe to the Honorable Patricia J. Gorence.) As attachments to that letter, the Defendants introduced affidavits from the GAB and the Walworth District Attorney to the

- 8 -

effect that the referenda reporting and disclosure requirements would not be enforced against Hatchett.

The Defendants did not enforce the referenda reporting and disclosure requirements against Hatchett. On March 31, 2010, this Court entered an order granting Hatchett's motion for a preliminary injunction, which enjoined the Defendants from enforcing the provisions of §§ 11.23 and 11.30, Wis. Stats., against Hatchett in relation to his advocacy regarding the April 6, 2010, referendum in Whitewater. On April 6, 2010, Whitewater voted on the local referendum.

Effective May 27, 2010, the Wisconsin legislature amended the reporting requirement and raised the statutory threshold by a factor of thirty, from $25 to $750.

In the future, Hatchett would like to engage in similar activity if a referendum of interest to him be placed on the ballot. He believes that similar referendums — either for or against the sale of liquor in the Whitewater — are likely as are referendums addressing other issues of interest to him and, accordingly, that there is a high likelihood that the same situation will arise in the future.

## ANALYSIS

*A. Justiciability*

The threshold question is whether Hatchett's claims have been rendered moot by events that transpired since the commencement of this action. The inquiry is critical because the power of federal courts is limited to justiciable cases or controversies under Article III of the Constitution, and, therefore, federal courts lack the power to hear non-justiciable cases, including cases that are rendered moot by superseding events occurring after the litigation commenced. *See Buckley v. Archer-Daniels-Midland Co.*, 111 F.3d 524, 526 (7th Cir. 1997); *see also Maher v. F.D.I.C.*, 441 F.3d 522, 525 (7th Cir. 2006).

- 9 -

Nevertheless, the question of mootness is inevitably one of judicial discretion, and the "party asserting mootness bears the burden of persuasion." *Wis. Right to Life, Inc. v. Schober*, 366 F.3d 485, 491 (7th Cir. 2004) (citation omitted).

Mootness is perhaps best described as "'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (citation omitted). The policy behind the doctrine is simple: courts should decline to decide issues which, by virtue of supervening circumstances, have lost their controversial vitality. Therefore, a case is rendered moot "'if there is no possible relief which the court could order that would benefit the party seeking it'" and the case "no longer presents a live case or controversy." *Maher*, 441 F.3d at 525 (citation omitted); *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 528 (7th Cir. 2001) (citation omitted). In assessing whether a claim is moot, courts "must consider any changes in the relationship between the parties that have occurred since . . . the date litigation commenced." *Schober*, 366 F.3d at 491.

Even if a claim is moot, however, a federal court can still review the claim if the questions are "capable of repetition, yet evading review." *Moore v. Ogilvie*, 394 U.S. 814, 815 (1969) (citation omitted). This well-recognized exception to mootness applies when two requirements are met: First, the challenged action must be too short in duration to be fully litigated prior to its cessation or expiration. *Tobin for Governor*, 268 F.3d at 529 (citations omitted). Second, there must be a "reasonable expectation that the same complaining party will be subjected to the same action again." *Id.* (citations omitted). Moreover, while "canonical statements" of this exception require that the dispute giving rise to the case be capable of repetition by the *same* plaintiff, "the courts, perhaps to avoid

- 10 -

complicating lawsuits with incessant interruptions to assure the continued existence of a live controversy, do not interpret the requirement literally, at least in abortion and election cases." *Majors v. Abell*, 317 F.3d 719, 723 (7th Cir. 2003) (collecting cases) ("*Majors I*"). Therefore, in determining if there is a reasonable expectation of repetition, the Court will "not keep interrogating the plaintiff to assess the likely trajectory of his political career." *Id.*

The Defendants rely on five intervening events that they contend render Hatchett's claims moot. The first three are materially similar and will be analyzed together. The Defendants first contend that Hatchett's claims are moot because the GAB sent a letter to Wisconsin's district attorneys advising them not to enforce Wis. Stat. §§ 11.23 and 11.30 against individuals "such as Mr. Hatchett." (Defs.' Br. Supp. Summ J. 2, 6.) After receiving this recommendation of nonenforcement letter, the Walworth County District Attorney indicated to Hatchett that he had no intention of enforcing the challenged disclosure and reporting requirements against Hatchett. Third, the Defendants advised this Court and the Hatchett that they would not enforce the challenged statutes. The Defendants contend that these three events considered together create an "affirmative indication" of intent not to enforce the statutes making Hatchett's action moot. (*Id.* at 5-6.)

The Defendants' attempts to show an "affirmative indication of intent" are predicated upon *Swaffer v. Deininger*, No. 08-CV-208, 2008 WL 5246167 (E.D. Wis. Dec. 17, 2008), which addressed the pre-amendment version of Wis. Stat. § 11.23, and Wis. Stat, § 11.30, which has not been amended. The Defendants contend that, in *Swaffer*, Judge Stadtmueller denied the defendants' motion to dismiss for mootness because he found that the GAB and the state had not made any "affirmative indication" as to their intentions to enforce the challenged statute going forward and there remained a "credible threat of prosecution." (Defs.' Br. Supp. Summ. J. 5-6.) The Defendants contend that, in the instant

- 11 -

case, such an indication has been made and, as a result, this action should be dismissed on justiciability grounds. (*Id.*)

However, in denying the motion to dismiss for mootness, *Swaffer*, 2008 WL 5246167, at *3, relied upon the Seventh Circuit's opinion in *Schober*. *Schober* found that Wisconsin Right to Life's claims were not justiciable because, even aside from the agency's public disclaimer that it would not enforce the challenged law: the law had not been enforced against anyone; the Wisconsin Attorney General had conceded the law was unconstitutional before any litigation ensued; and, the law had been declared *facially* unconstitutional and void in an earlier case. *Schober*, 366 F.3d at 489-91. Based on the combination of those circumstances, the Seventh Circuit found that the case was moot. *Id.* Neither *Schober* nor *Swaffer*'s reference to *Schober* establish that an affirmative indication of intent not to enforce alone is sufficient to moot a plaintiff's claim.

Even if the three cited events constitute an "affirmative indication" of intent not to enforce the statutes, it would not remove the source of the injury – the statutes. As emphasized by *Majors I*, a credible threat of prosecution "is latent in the existence of the statute." 317 F.3d at 721. Therefore, if the statute "arguably covers" a plaintiff's conduct, and "so may deter constitutionally protected expression," there is still standing despite the enforcing agency's assurances that it applies an alternative interpretation that would relieve the threat. *Id.* (citations omitted). In short, any nonenforcement statements made by the GAB or the Walworth County District Attorney have a limited effect on the threat of prosecution, because they lack the authority or effect of law. Moreover, such statements are inherently impermanent, and do not provide the certitude that Hatchett needs to engage in his political speech with vigor and confidence. These statements only provide assurance to the

- 12 -

extent that the Defendants abide by their promises *and* remain in their official positions. A credible threat of prosecution still exists because these parties or their successors may renege on their promises and enforce the statutes as written. Also, even if the Defendants keep their promises, the possibility exists that a third-party could force an application of the laws in accordance with their plain meaning.

The Defendants' attempts to narrow the statutes' application against Hatchett and "individuals like" him underscores the constitutional problems at play. As eloquently stated by the Supreme Court, "[t]he Government's assurance that it will apply [a statute] far more restrictively than its language provides is pertinent only as an implicit acknowledgment of the potential constitutional problems with a more natural reading." *United States v. Stevens*, _ U.S. __, 130 S.Ct. 1577, 1591 (2010). While the nonenforcement letter was a reasonable attempt to remedy the statutes, it does not negate the credible threat of prosecution and does not moot Hatchett's case.

The fourth event the Defendants rely upon in asserting that Hatchett's claims are moot is that he completed his anonymous referendum advocacy without complying with the law and without any repercussions. (Defs.' Br. Supp. Summ. J. 2, 6.) While the preliminary injunction diminished the *immediate* threat of prosecution, it is important not to confuse the threat of enforcement that existed relative to Hatchett's immediate advocacy, with the broader threat of enforcement that must be considered by this Court with respect to Hatchett's requests for declaratory and permanent injunctive relief. *See N.H. Right to Life*

- 13 -

*Political Action Comm. v. Gardner*,[3] 99 F.3d 8, 17-18 (1st Cir. 1996) (reversing a district court's dismissal of a plaintiff's action for declaratory relief and injunctive relief for lack of standing because the state indicated that it would not take enforcement action against the plaintiff based on the state's analysis of the pattern of contacts between the N-PAC and the candidate it supported). Although Hatchett obtained preliminary injunction for his immediate planned activities, he seeks a permanent injunction and declaration judgment that the statutes are unconstitutional, as-applied and facially. The past non-enforcement does not resolve these requests, which affect advocacy that Hatchett may choose to undertake with regard to *future* referendums. Consequently, with respect to the requests for a permanent injunction and declaratory relief, the action is not moot.

The fifth and most compelling event that the Defendants rely upon in asserting that Hatchett's claims are moot hinges upon the Wisconsin legislature's amendment to Wis. Stat. § 11.23, which increased the statutory trigger by a factor of thirty, from $25 to $750. (Defs.' Br. Supp. Summ. J. 2, 6.) Emphasizing that Hatchett only spent $300 during the 2010 referendum, the Defendants assert that there is no evidence that Whitewater will schedule another referendum in the foreseeable future or that the costs of future advocacy by Hatchett will reach the new statutory trigger. (*Id.* at 6-7.) Thus, the Defendants contend that the case is moot, at least with respect to § 11.23.[4] (Defs.' Br. Opp'n Pl.'s Mot. Summ.

---

[3]Parenthetically the Court notes, somewhat ironically, for the current time-period in the aftermath of Hurricane/Tropical Storm Irene, the *Gardner* court's opinion opens: "Like forecasted hurricanes, approaching elections invariably give rise not only to gusts of wind but also to feverish preparations. And, just as the prudent fisherman does not trust in chance to save his boat from the gathering storm, the sage political activist does not rely on an unenlightened electorate to save [his] candidate from the vicissitudes of the ballot box." 99 F.3d at 10.

[4]The fifth event does not apply to Wis. Stat. § 11.30, because it was not amended.

- 14 -

J. 4.)  Comparing this case to *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992), where one of the plaintiff's members indicated that she had an intent to return to Sri Lanka, but did not have any current plans to do so, the Defendants argue that the alleged injury is conjectural and hypothetical, because Hatchett's future plans are similarly "in doubt." (*Id.*)

The Defendants also quote *Zessar v. Keith*, which states that "any dispute over the constitutionality of a statute becomes moot if a new statute is enacted in its place during the pendency of the litigation, and the plaintiff seeks only prospective relief." 536 F.3d 788, 793 (7th Cir. 2008) (citations omitted).  True, the "complete repeal" of a statute "naturally renders a request for an injunction against the application of that statute moot." *See Rembert v. Sheahan*, 62 F.3d 937, 940-41 (7th Cir. 1995)  However, here, a new statute was not enacted; instead, the original statute was simply amended by increasing the monetary trigger as described above, leaving the balance of the statute intact.

While statutory amendments may still moot a case, it is not axiomatic that a statutory amendment makes a challenge to that statute no longer justiciable.  Instead, amendments render a case moot only when the amendment "clearly rectifies the statute's alleged defects." *Id.* (citations omitted).  Stated somewhat differently, "if the injury of which a plaintiff complains continues even under the amended statute, then the possible issuance of an injunction promises a measure of relief, and a court may act." *Id.*

Here, the focus of Hatchett's challenge to § 11.23 is not the specific amount of the statutory trigger.  Rather, the crux of the Hatchett's claim is that § 11.23 is unconstitutional because it imposes what he describes as "PAC-style" requirements upon groups or individuals solely on the basis of *any* monetary trigger. (Pl.'s Reply Supp. Mot. Summ J.  1-5.)  According to Hatchett, the Supreme Court has established and reaffirmed

- 15 -

that such PAC requirements can only be imposed upon persons or groups with *the* major purpose of regulating campaign advocacy, not even groups with *a* major purpose of campaign advocacy, and surely not on the basis of some flat monetary trigger. (*Id.*)

The trigger amount is immaterial to Hatchett's argument because it does not affect the alleged constitutional flaws in the statute, which lie with the trigger itself, and the lack of consideration of an entity's major purpose, not the specific amount of the trigger. Therefore, without reaching the merits of the argument, the Court concludes that the new amendment does not "rectify" the § 11.23's asserted defects, and does not render the case moot.

Furthermore, even if the May 2010 amendment mooted Hatchett's challenge to § 11.23, Hatchett's claims fall squarely within the capable of repetition yet evading review exception to the mootness doctrine. The record before the Court, provides a reasonable basis for concluding that Whitewater will conduct similar referendums in the future; that Hatchett will challenge such referendums, as he has in the past; and, that Hatchett or someone in a similar position will surpass the new statutory trigger.

Clearly, the town of Whitewater is an area that is in the midst of social flux, especially regarding liquor sales. Moreover, Hatchett has explicitly indicated in his Complaint that he "would like to participate in similar activity in the future should a referendum of interest to him be placed on the ballot." (Compl. ¶ 34.) Hatchett maintains that "similar referendums — either for or against the sale of liquor in Whitewater — are likely as are referendums addressing other issues of interest to him." (*Id.*) Hatchett's strong belief is that the sale of alcohol in Whitewater is not in the best interests of the community; and it is not unreasonable to expect that he may have strong feelings with respect to other

- 16 -

referendum issues in the future or even the same issue, if it resurfaces. (Compl. ¶ 25.) In fact, Hatchett's verified Complaint states there is a "high likelihood that the same situation will arise in the future." (*Id*. at ¶ 34.) Hatchett is not required to somehow prove that Whitewater will have such referendums, or that he will actually advocate for or against those referendums. Requiring such proof would amount to "interrogating the plaintiff to assess the likely trajectory of his [advocacy] career," an inquiry frowned upon by the Court of Appeals for this Circuit. *See Majors I*, 317 F.3d at 723.

Regarding the statutory trigger, the Defendants emphasize that Hatchett spent "only" $300 on postage, cards, printing, and similar items while advocating against the 2010 referendum. (Defs.' Br. Supp. Summ. J. 6-7.) However, Hatchett still spent this amount of money after securing an attorney, preparing his case, and moving this Court for a preliminary injunction not once, but twice. Hatchett also began his advocacy after the March 31, 2010, issuance of preliminary injunction – a day later than the date Hatchett considered to be the latest possible date for effective advocacy. (*See* Compl. ¶ 33.) If Hatchett started his advocacy earlier, he may have spent more money.

Furthermore, with this particular referendum, Hatchett determined that the prime time to start was a little over a week before the referendum. (*Id*.) Clearly, it is possible that with a future referendum, he would make a strategic decision to begin his advocacy earlier and, as a result, spend more money; especially, if he has the assurance of a permanent injunction against prosecution or a declaration that the statute is unconstitutional.

The Court also notes that, in *Swaffer*, involving similar facts, $500 was the estimated cost of producing and distributing postcards and signs advocating against a liquor

- 17 -

referendum in the Town of Whitewater – a sum that is significantly closer to the new trigger. *See Swaffer*, 610 F. Supp. 2d at 964-65. With increasing printing and postage costs, it is reasonably probable that Hatchett or someone in a similar position will surpass the new trigger. But, again, requiring Hatchett to prove that his expenditures would exceed the $750 trigger for § 11.23 of the Wisconsin Statutes is akin to "interrogating the plaintiff," and contrary to this circuit's precedent. *See Majors I*, 317 F.3d at 723.

To reiterate, the Defendants have not met their burden of persuasion in showing that events that transpired since this action was commenced have rendered Hatchett's claims moot and, therefore, not justiciable. Consequently, the Court will address the merits of Hatchett's First Amendment challenges. Because §§ 11.30 and 11.23 raise distinct issues under the First Amendment, the Court will analyze each statute separately.

B.  *Constitutionality of Section 11.30 of the Wisconsin Statutes*

The First Amendment states, in part, that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Where, as here, a law significantly implicates such imperative constitutional guarantees, the Court traditionally balances interests. In practice, this requires asking "'whether the statute burdens any one such interest in a manner out of proportion of the statute's salutary affects upon the others.'" *See Doe v. Reed*, __ U.S. ___ , 130 S.Ct. 2811, 2822 (2010) (Breyer, J., concurring) (citation omitted). Therefore, in this case, the Court must weigh the state's interest in enforcing the challenged disclosure and reporting requirements against Hatchett's interests in freely exercising his First Amendment rights. *See id.*

As set out in Chapter 11's declaration of policy, the state has determined that both its disclosure and reporting requirements are designed to promote three specific state

- 18 -

interests: (1) To provide for a better informed electorate; (2) To prevent corruption or the appearance thereof in the democratic process; and, (3) To maintain the integrity of the electoral process. *See* Wis. Stat. § 11.001. The parties strongly disagree regarding the level of scrutiny that should be applied to Hatchett's claims and, consequently, on how sufficient these state interests must be in order for this Court to uphold the statutes.

Hatchett asserts that this Court should apply "strict scrutiny" to both §§ 11.30 and 11.23, which necessitates that the state have a "compelling" governmental interest, and that the law be "narrowly tailored" to achieve that compelling interest. (*See* Pl.'s Mem. Supp. Summ. J. 14.) The Defendants counter contending that the Court should apply the more lenient standard of "exacting scrutiny," a standard that is akin to intermediate scrutiny, which requires only an "important" governmental interest and a "substantial relationship" between the law and that important interest. (*See* Defs.' Br. Supp. Summ. J. 12.)

In considering the appropriate degree of scrutiny, the Court cannot overlook that Hatchett challenges two separate, although closely related, statutes that raise distinct issues under the First Amendment. Section 11.30 of the Wisconsin Statutes is a simple "disclosure requirement,"[5] which, in pertinent part, provides as follows:

> (1) No disbursement may be made or obligation incurred anonymously, and no contribution or disbursement may be made or obligation incurred in a fictitious name or by one person or organization in the name of another for any political purpose.

---

[5]The terminology used to refer to these types of statutes can be confusing. Courts sometimes refer to source attribution requirements such as § 11.30 as "disclaimers," and registration, record-keeping, and reporting requirements such as § 11.23 as "disclosures." This Court is of the opinion that "disclaimer" is somewhat of a misnomer in this context, as discussed in more detail by the Seventh Circuit. *See Majors v. Abell*, 361 F.3d 349, 350 (7th Cir. 2004) ("*Majors II*"). Accordingly, in this opinion, "reporting requirements" will refer to the requirements under § 11.23, and "disclosure requirements" will refer to the source attribution requirements under § 11.30.

- 19 -

(2)(a) The source of every printed advertisement, billboard, handbill, sample ballot, television or radio advertisement or other communication which is paid for by or through any contribution, disbursement or incurred obligation shall clearly appear thereon. This paragraph does not apply to communications for which reporting is not required under s. 11.06(2).

\* \* \*

(c) Every such communication which is directly paid for or reimbursed by an individual, including a candidate without a personal campaign committee who is serving as his or her own treasurer, or for which an individual assumes responsibility, whether by the acceptance of a contribution or by the making of a disbursement, shall be identified by the words "Paid for by" followed by the name of the candidate or other individual making the payment or reimbursement or assuming responsibility for the communication. No abbreviation may be used in identifying the name of a committee or group under this paragraph.

Wis. Stat. § 11.30. The GAB has interpreted "communication" broadly as "any printed advertisement, billboard, handbill, sample ballot, television or radio advertisement, telephone call, and any other form of communication that may be utilized by a registrant for the purpose of influencing the election or nomination of any individual to state or local office or for the purpose of influencing a particular vote at a referendum." Wis. Admin. Code [GAB] § 1.655(1)(b). As a result of this expansive definition, virtually any communications paid for by a disbursement, such as Hatchett's postcards and flyers, must include "the words 'Paid for by' followed by the name of the candidate or other individual making the payment . . . ." *See* Wis. Stat. § 11.30(2)(c). Moreover, failure to comply with the disclosure requirement can trigger either civil enforcement actions or criminal prosecutions. *See* Wis. Stat. §§ 11.60 and 11.61.

- 20 -

The Wisconsin disclosure statute, which creates a broad prohibition of anonymous political speech, is inherently a content-based restriction. The statute is content-based not only because it compels a speaker to add information to his message that he would otherwise not choose to include, thereby forcing the speaker to conform his message to the content that the government desires but, more importantly, because the category of covered documents is defined exclusively by content: The statute only applies to speech designed to influence voters in an election — no other speech needs to bear the require markings.

As a general rule, content-based regulations are subjected to the heightened standard of strict scrutiny, meaning that there must be a compelling state interest and that the law must be narrowly tailored to achieve that interest. For example, in *United States v. Playboy Entertainment Group, Inc.*, the Supreme Court made the general rule rather clear: "If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest. If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." 529 U.S. 803, 813 (2000) (citations omitted). On many occasions, the Supreme Court has repeated this general rule. *See, e.g., Sable Commc'ns of Cal. v. F.C.C.*, 492 U.S. 115, 126 (1989) ("The Government may . . . regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest.").

This general rule, however, does not appear to apply to basic disclosure statutes such as § 11.30. For example, in *Citizens United v. Federal Election Commission*, the Supreme Court was rather explicit in applying only exacting scrutiny in a very similar context: "Disclaimer [disclosure] . . . requirements may burden the ability to speak, but they

- 21 -

'impose no ceiling on campaign-related activities,' and 'do not prevent anyone from speaking.' The [Supreme] Court has subjected these requirements to 'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." ____ U.S. ____ , 130 S.Ct. 876, 914 (2010) (citations omitted). The Defendants advocate this test.

However, earlier in *McIntyre v. Ohio Elections Commission*, the Supreme Court seemed to reach the opposite conclusion, but not without leaving some uncertainty. When confronted with a statute similar to Wis. Stat. § 11.30, the Supreme Court stated that it would apply "exacting scrutiny," but then went on to conclude it would "uphold the restriction only if it is narrowly tailored to serve an overriding state interest," which suggests strict scrutiny. 514 U.S. 334, 346 (1995) (citation omitted). Although advocating for this earlier test, Hatchett concedes that there is some inconsistency in this area.

Notwithstanding the Supreme Court's earlier *McIntyre* holding, its recent opinions reinforce that exacting scrutiny is the standard to be applied to disclosure requirements in the electoral context, even though such disclosures undeniably may be content-based. In *Reed*, for example, the Supreme Court addressed a state law requiring disclosure of referendum petitions, 130 S.Ct. at 2815, and stated that "[w]e [the Supreme Court] have a series of precedents considering First Amendment challenges to disclosure requirements in the electoral context. These precedents have reviewed such challenges under what has been termed 'exacting scrutiny.'" *Id.* at 2818 (collecting cases). The Supreme Court then went on to clarify that the exacting scrutiny standard "'requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest.'" *Id.* (citations omitted).

Similarly, in *Davis v. Federal Election Commission*, the Supreme Court considered federal provisions requiring a candidate to disclose to his opponent that he intended to spend more than $350,000 in personal funds on his campaign, among other things. 554 U.S. 724, 729 (2008). In assessing the First Amendment challenge to these provisions, the Court emphasized that "there must be 'a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed,' and the governmental interest 'must survive exacting scrutiny.'" *Id.* at 744.

Most importantly, in *Citizens United*, the Supreme Court addressed disclosure provisions very similar to Wis. Stat. § 11.30. The opinion addressed a federal law that required televised electioneering communications funded by anyone other than a candidate to include a "disclaimer" that "'_____ is responsible for the content of this advertising.'" *Citizens United*, 130 S.Ct. at 913-14. The Supreme Court upheld that disclosure requirement under "'exacting scrutiny'" which "requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest.'" *Id.* at 914. Together, these holdings eliminate any confusion caused by *McIntyre's* seemingly inconsistent language.[6]

By its plain terms, § 11.30 is a broad prohibition of anonymous political advocacy. The Supreme Court has long recognized that "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment," and

---

[6]While this complex and changing Supreme Court precedent is intriguing, the determination as to the type of scrutiny that should be applied to § 11.30 of the Wisconsin Statutes is not critical in this action. As will be further explained, this Court concludes that § 11.30 does not pass constitutional muster even under the more lenient "exacting scrutiny" standard. *See also, Swaffer*, 610 F. Supp. 2d at 970.

"the anonymity of an author is not ordinarily a sufficient reason to exclude [his] work product from the protections of the First Amendment." *McIntyre*, 514 U.S. at 341-42. The Supreme Court has also emphasized that "[a]nonymity is a shield from the tyranny of the majority." *Id.* at 357 (citation omitted). It thus "exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation – and their ideas from suppression – at the hand of an intolerant society." *Id*. A decision in favor of anonymity may be motivated "by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *Id.* at 341-42. Regardless of Hatchett's motivations, his choice to remain anonymous is no different from any other element of a document's content that an author is free to exclude. When anonymity is prohibited, the state inevitably chills freedom of speech, and the law must pass exacting scrutiny. That burden cannot be met here.

As mentioned above, the Defendants proffer two governmental interests served by § 11.30, garnered from § 11.001's declaration of policy. First, the Defendants assert that § 11.30 is necessary to provide for an informed electorate, emphasizing that the statute "provides the electorate with crucial information about the political message they receive." (Defs.' Br. Supp. Summ. J. 16.) They contend that the statute "answers exactly *who* is advocating a particular outcome" and "aids voters in making informed decisions about which side to support and how much weight to give a particular ad." (*Id*.) (Emphasis in original.)

Second, the Defendants assert that § 11.30 is necessary to prevent corruption or the appearance of corruption in the democratic process, indicating that "[t]hose with a vested interest in the outcome of a referendum are forced out into the open and their vested interest is made immediately apparent to the electorate." (*Id*.) "If groups and individuals are

- 24 -

forced to 'stand by their ads,' then they are less likely to become 'mouthpieces' for special interest groups who may attempt to end-run around the reporting requirements." (*Id*.) The Defendants contend that Hatchett's interest in anonymous advocacy, when balanced against these state interests, does not justify invalidating the referenda reporting and disclosure requirements. (*Id*. at 11.)

While the Defendants' asserted interests may be important and, even compelling in the context of regulating contributions in elections for public office, this Court finds that they are not relevant in referenda elections. Regarding the anti-corruption interest, the Supreme Court has repeatedly emphasized that such an interest is far diminished in the referendum context: "Referenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978)(internal citation omitted); *see also Reed*, 130 S.Ct. at 2840 (recognizing that the risk of fraud or corruption is more remote at the petition stage of an initiative than at the time of balloting); *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 298 (1981) (stating that the risk of corruption in cases involving candidate elections is not present in a popular vote on a public issue). The mere fact that advocacy "may influence the electorate is hardly a reason to suppress it." *City of Berkeley*, 454 U.S. at 298 (citation omitted). Because "ballot initiatives do not involve the risk of '*quid pro quo*' corruption present when money is paid to, or for, candidates," *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 648 (1999), this Court does not find the anti-corruption interest to being sufficiently important to justify § 11.30's chilling effect upon free speech. *See also, Swaffer*, 610 F. Supp. 2d at 970 (holding § 11.30 to be unconstitutional as applied to the plaintiff).

- 25 -

Similarly, the asserted interest in providing for an informed electorate is not sufficiently important to withstand exacting scrutiny. This "less powerful interest" was explicitly rejected in *McIntyre*, where the Supreme Court emphasized that "[t]he simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures [he] would otherwise omit." 514 U.S. at 348. The Supreme Court held, in the case of a "handbill written by a private citizen who is not known to the recipient, the name and address of the author add little, if anything, to the reader's ability to evaluate the document's message." *Id.* Instead, the best "test of truth is the power of the thought to get itself accepted in the *competition of the market*." *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting) (emphasis added).

Additionally, the Supreme Court admonished against underestimating the common man:

> 'People are intelligent enough to evaluate the source of an anonymous writing. They can see it is anonymous. They know it is anonymous. They can evaluate its anonymity along with its message, as long as they are permitted, as they must be, to read that message. And then, once they have done so, it is for them to decide what is 'responsible,' what is valuable, and what is truth.'

*McIntyre*, 514 U.S. at 349 n.11 (citation omitted).

Like the Ohio statute in *McIntyr*e, Wis. Stat. § 11.30 creates a broad prohibition of anonymous political speech, and the articulated state interests in guarding against corruption and providing information to the electorate are insufficient with respect "to the type of independent activities pursued by [the] plaintiff[]." *See Swaffer*, 610 F. Supp. 2d at 970 (citing *McIntyre*, 514 U.S. at 350-55). While *McIntyre* appears to have applied strict

- 26 -

scrutiny, this Court does not find that the result differs under the exacting scrutiny standard. Simply stated, the inherent worth of speech in terms of its capacity to inform the public does not depend upon the identity of its source, at least in the context of referenda.

The Defendants argue that the *McIntyre* holding is a very "fact-specific" and should yield to the more recent and relevant stream of Supreme Court cases. (Defs.' Br. Opp. Pl.'s Mot. Summ. J. 4-5.)  However, the Defendants do not fully develop this argument, and this Court has no obligation to formulate arguments for a party.  *See Spath v. Hayes Wheels Int'l–Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000);  *See also, United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) (holding that the Seventh Circuit has "made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).

As highlighted in *Swaffer*, the only notable difference between § 11.30 and the Ohio statute invalidated in *McIntyre* is that § 11.30 requires only the name of the source to be disclosed, as opposed to the author's name and address under the Ohio statute.  *Swaffer*, 610 F.Supp. 2d at 970.  Such differences are negligible.  Both the Wisconsin statute and the asserted state interests are unchanged since *Swaffer*.  This Court, holds as did *Swaffer*, that § 11.30 and § 1.655, its correlative administrative rule, run afoul of the First Amendment as applied to Hatchett.

*C.  Constitutionality of Section 11.23 of the Wisconsin Statutes*

As previously emphasized, Hatchett is challenging two separate, but closely related Wisconsin election laws, that impose distinct First Amendment burdens.  While § 11.30 is a "disclosure" statute that imposes a broad prohibition of anonymous political advocacy, § 11.23 is a "reporting" statute that imposes a complex array of registration,

- 27 -

reporting, and record-keeping requirements upon individuals and groups that meet the statutory trigger.

> Section 11.23(1) of the Wisconsin Statutes provides as follows:

> Any group or individual may promote or oppose a particular vote at any referendum in this state. Except as authorized in s. 11.05(12)(b) and (13), before a group makes or accepts contributions, makes disbursements, or incurs obligations in excess of $750 in the aggregate in a calendar year for such purposes, and before an individual accepts contributions, makes disbursements, or incurs obligations in excess of $750 in the aggregate in a calendar year for such purposes, the group or individual shall file a registration statement under s. 11.05(1), (2) or (2r). In the case of a group the name and mailing address of each of its officers shall be given in the statement. Every group and every individual under this section shall designate a campaign depository account under s. 11.14. Every group shall appoint a treasurer, who may delegate authority but is jointly responsible for the actions of his or her authorized designee for purposes of civil liability under this chapter. The appropriate filing officer shall be notified by a group of any change in its treasurer within 10 days of the changed under s. 10.05(5). The treasurer of a group shall certify the correctness of each statement or report submitted by it under this chapter.

Section 11.23(2) prohibits use of anonymous donations of more than $10 and directs their disposition as follows:

> Any anonymous contribution exceeding $10 received by an individual or group treasurer may not be used or expended. The contribution shall be donated to the common school fund or to any charitable organization at the option of the treasurer.

Sections 11.23(3) through (6) establish the following reporting requirements:

> (3) All contributions, disbursements and incurred obligations exceeding $10 shall be recorded by the group treasurer or the individual. He or she shall maintain such records in an organized and legible manner, for not less than 3 years after the date of a referendum in which the group or individual participates. If a report is submitted under s. 11.19(1), the

- 28 -

records may be transferred to a continuing group or to the appropriate filing officer for retention. Records shall include the information required under s. 11.06(1).

(4) Each group or individual shall file periodic reports as provided in ss. 11.06, 11.19 and 11.20. Every individual acting for the purpose of influencing the outcome of a referendum shall be deemed his or her own treasurer. No disbursement may be made or obligation incurred by or on behalf of a group without the authorization of the treasurer or the treasurer's designated agents. No contribution may be accepted and no disbursement may be made or obligation incurred by any group at a time when there is a vacancy in the office of treasurer.

(5) If a group which operates as a political committee has filed a single registration statement, any report of that group which concerns activities being carried on as a political committee under this chapter shall contain a separate itemization of such activities, whenever itemization is required.

(6) If any contribution or contributions of $500 or more cumulatively are received by a group or individual supporting or opposing the adoption of a referendum question from a single contributor later than 15 days prior to an election such that it is not included in the preprimary or preelection report submitted under s. 11.20(3), the treasurer of the group or the individual receiving the contribution shall within 24 hours of receipt inform the appropriate filing officer of the information required under s. 11.06(1) in such manner as the board may prescribe. The information shall also be included in the treasurer's or individual's next regular report. For purposes of the reporting requirement under this subsection, only contributions received during the period beginning with the day after the last date covered on the preelection report, and ending with the day before the election need be reported.

Wis. Stat. § 11.23(3)-(6).

As *Swaffer* highlights, section 11.23 imposes five major requirements upon groups and individuals, like Hatchett. The statute, along with its corresponding sections in Chapter 11 of the Wisconsin Statutes, requires any individuals disbursing, receiving, or incurring obligations in excess of $750 in a calendar year for the purpose of promoting or

- 29 -

opposing a referendum in Wisconsin to: "(1) file a registration statement with a designated filing official; (2) keep a dedicated bank account; (3) refuse anonymous contributions greater than $10.00; (4) keep records of all contributions received, disbursements made and obligations incurred for at least three years after the referendum; and (5) file preelection reports and a termination statement with the GAB." *Swaffer*, 610 F. Supp. 2d at 968.

In the case of an individual, the registration statement must include the individual's name, mailing address, principal office, and the "nature of any referendum which is supported or opposed." Wis. Stat. § 11.05(3). The registration statement further must provide the name and mailing address of the campaign treasurer and any other custodian of books and accounts. (*Id*.) In addition, the registration statement must disclose the name and address, and account number of the campaign depository account and any other institution where funds are kept, or safety deposit boxes are used. *Id*. These registration requirements act to inhibit the open exchange of ideas and political conversations on referendum issues, "at least with respect to individual Wisconsinites," such as Hatchett, who seeks "to inject his opinion into the public debate." *See Swaffer*, 610 F. Supp. 2d at 968. Then, when this initial burden is met, the individual must record all contributions, disbursements, and incurred obligations exceeding $10, and maintain organized and legible records, for no less than three years after the date of the referendum. Wis. Stat. § 11.23(3).

Furthermore, unless a registrant indicates on his registration statement that the registrant will not accept contributions, incur obligations, or make disbursements in excess of $1,000 in any calendar year *and* will not accept any contribution for a single source exceeding $750 in such a year, the registrant must filing ongoing reports. Wis. Stat.

- 30 -

§ 11.05(2r). These reports must continue until the registrant fulfills the statutory dissolution and termination requirements. *Id.*

Hatchett endeavors to equate the Wisconsin reporting requirements with what he terms the "PAC-style" ("political action committee") requirements that *Citizens United* struck down. (Pl.'s Mot. Summ. J. 9-13.) In *Citizens United*, 130 S.Ct. 887, the Supreme Court addressed the Bi-Partisan Campaign Reform Act of 2002 ("BCRA"), which prohibited corporations and unions from using general treasury funds to make expenditures for "electioneering communication" or for speech expressly advocating the election or defeat of a candidate. Corporations and unions could, however, establish a "separate segregated fund" or "PAC" fund for these purposes. *Id.* at 887-88. The moneys received by the segregated fund were limited to donations from stockholders and employees of the corporation or, in the case of unions, members of the union. *Id.*

Emphasizing the applicability of the strict scrutiny standard, the Supreme Court held that the BCRA was an impermissible ban on independent expenditures by corporations, regardless of corporations' abilities to form PACs. The Supreme Court explained:

> Section 441b is a ban on corporate speech notwithstanding the fact that a PAC created by a corporation can still speak. A PAC is a separate association from the corporation. So the PAC exemption from § 441b's expenditure band, § 441b(b)(2), does not allow corporations to speak. Even if a PAC could somehow allow a corporation to speak – and it does not – the option to form PACs does not alleviate the First Amendment problems with § 441b. PACs are burdensome alternatives; they are expensive to administer and subject to extensive regulations. For example, every PAC must appoint a treasurer, forward donations to the treasurer promptly, keep detailed records of the identities of the persons making the donations, preserve receipts for three years, and file an organizational statement and report changes to this information within ten days.

*Id.* at 897 (citations omitted).

The Supreme Court further expounded:

- 31 -

And that is just the beginning. PACs must file detailed monthly reported with the FEC, which are due at different times depending on the type of election that is about to occur:

> These reports must contain information regarding the amount of cash on hand; the total amount of receipts, detailed by 10 different categories; the identification of each political committee and candidate's authorized or affiliated committee making contributions, and any persons making loans, providing rebates, refunds, dividends, or interest or any other offset to operating expenditures in an aggregate amount over $200; the total amount of all disbursements, detailed by 12 different categories; the names of all authorized or affiliated committees to whom expenditures aggregating over $200 have been made; persons to whom loan repayments or refunds have been made; the total sum of all contributions, operating expenses, outstanding debts and obligations, and the settlement terms of the retirement of any debt or obligation.

*Id.* (citations omitted). The Supreme Court held that the federal PACs were "burdensome alternatives" because, in addition to the fact that a PAC was a separate association, the PACs were required to (1) appoint a treasurer and forward donations to the treasurer; (2) keep detailed records and receipts for an extended period of time, including information on the identity of donors; (3) file and update an organizational statement; and, (4) file detailed monthly reports disclosing various information such as the PAC's operating expenses, receipts, assets, contributions, expenditures, and debt. *Id.*

Hatchett argues that the federal PAC requirements closely "track" the requirements of Wis. Stat. § 11.23 and, therefore, strict scrutiny should also be applied in this case. (Pl.'s Mem. Supp. Summ. J. 10-11.) This Court does not agree. Although there are some general similarities between § 11.23 of the Wisconsin Statutes and the requirements

- 32 -

listed in *Citizen United*, the Supreme Court's holding in that case was based on the cumulative effect of all the regulations. The Supreme Court stated that, "PACs are burdensome alternatives; they are *expensive* to administer and subject to *extensive* regulations." *Id.* at 897 (emphasis added).

Moreover, the Supreme Court greatly emphasized that federal PACs prevented a corporation from speaking on its own behalf. *Citizens United*, 130 S.Ct. at 897. Instead, a federal PAC is a separate association, usually an independent non-profit organization, that is also subject to additional organizational obligations under federal tax law. *See* 26 U.S.C. § 527. It is the aggregate of these burdens that distinguishes *Citizens United* from the instant action.

Under Wisconsin law, a group or individual must register, appoint a treasurer (who can be the individual himself), and file periodic reports. However, a group or an individual does not have to form a "separate association," and the group or individual remains fully able engage in speech. Additionally the periodic reporting and basic record-keeping requirements are far less costly and onerous than the required detailed monthly reports of *Citizens United*.

Indeed, *Citizens United* upheld, under exacting scrutiny, a separate law that required detailed record-keeping and reporting requirements, albeit a more event-driven type law. *Id.* at 914. The federal law required that anyone who spent more than $10,000 on electioneering communications within a calendar year to file a report indicating (1) the identity of the individual or entity making the expenditure; (2) the custodian of the books and accounts of the person making the disbursement; (3) the amount of each disbursement of more than $200 during the period covered by the statement and the identification of the

- 33 -

person to whom the disbursement was made; (4) the election(s) to which the electioneering communications pertained and the names (if known) of the candidates identified or to be identified; and, (5) the names and address of anyone who contributed $1,000 or more to the person or entity that paid for the electioneering communications. 2 U.S.C. § 434(f). In terms of the degree of the burden imposed, these requirements are more like the reporting requirements of § 11.23 of the Wisconsin Statutes, than the particularly burdensome PAC provisions that *Citizen's United* struck down.

Because Wisconsin Statute § 11.23's provisions are less onerous those of the federal PAC regulations, *Citizens United* is distinguishable. Consequently, this Court will not apply strict scrutiny. Moreover, because this Court concludes that § 11.23 does not constitute the "PAC-style" requirements at issue in *Citizens United*, the Court need not address Hatchett's further contentions that only organizations whose "major purpose" is regulation of campaign advocacy can be subject to such PAC-style requirements. (*See* Pl.'s Reply Supp. Mot. Summ. J. 1-3.) With respect to § 11.23, the appropriate standard is exacting scrutiny. *See also*, *Swaffer*, 610 F. Supp. 2d at 967-68 (applying exacting scrutiny to the pre-amendment version of § 11.23).

Although predating *Citizens United*, *Swaffer* is consistent with the Supreme Court's usual treatment of record-keeping and reporting requirements in the electoral context, with the notable exception of the unique PAC requirements addressed in *Citizens United*. Prior Supreme Court cases have treated reporting (often called "disclosure") requirements such as § 11.23 in the same manner as they treated the disclosure (often called "disclaimer") requirements such as § 11.30, rarely differentiating between the two types of requirements.

For example, when addressing the BCRA's event-driven (not PAC) reporting

- 34 -

requirements, *Citizens United* made this quite clear: "Disclaimer [disclosure] *and* disclosure [record-keeping and reporting][7] requirements may burden the ability to speak, but *they* 'impose no ceiling on campaign-related activities,' and 'do not prevent anyone from speaking.' The [Supreme] Court has subjected *these requirements* to 'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Citizens United*, 130 S.Ct. at 914 (citations omitted) (emphasis added). Thus, notwithstanding the strict scrutiny applied to the unique PAC requirements of § 441b, the Supreme Court was clear that both disclosures like § 11.30 and general record-keeping and reporting requirements like §11.23 are to be reviewed under exacting scrutiny.

Application of the exacting scrutiny standard is also consistent with the earlier holding in *Buckley v. Valeo*, 424 U.S. 1, 63 (1976), which dealt with provisions of the Federal Election Campaign Act ("FECA") that required political committees to register, keep detailed records of both contributions and expenditures, and file detailed quarterly reports – much like the requirements imposed upon groups and individuals in the instant case. The Supreme Court concluded that these "reporting requirements" "must survive exacting scrutiny." *Id.* at 64-65.

The state asserts the same interests regarding § 11.23 as § 11.30: (1) To provide for an informed electorate; (2) To prevent corruption or the appearance thereof in the democratic process; and (3) To maintain the integrity of the electoral process. *See* Wis.

---

[7]As previously noted, the inconsistences among courts in their use of this terminology can be confusing. This Court has, and will continue, to refer to the registration, record-keeping, and reporting requirements of § 11.23 as "reporting requirements," and the source-disclosure requirements of § 11.30 as "disclosure requirements." This is consistent with the Seventh Circuit. *See Majors II*, 361 F.3d at 450. In *Citizens United*, however, the Supreme Court referred to reporting requirements as "disclosures" and source-attribution requirements as "disclaimers."

Stat. § 11.001. Regarding the first state interest, the Defendants argue that § 11.23's registration and reporting requirements inform the electorate precisely who is spending the money to influence an initiative, and how much money is being spent. This, in turn, allows voters to determine if they want to support or oppose that cause, and also helps voters gauge the advocate's interest level. (Defs.' Br. Supp. Summ. J. 13.) These requirements, according to the Defendants, also provide information as to who else is supporting the group or individual that seeks to influence the referenda, which in turn helps voters determine if they want to be associated with that person or group. (*Id*.) Regarding the second interest, the Defendants contend that § 11.23 is necessary to provide information on *"who has a vested interest* in a particular referendum outcome." (*Id*. at 14.) Without these requirements, the Defendants argue, groups and individuals could make unlimited expenditures to influence the outcome of a referendum without the public's knowledge. (*Id*.)

Just as these interests lack sufficient importance to justify the source attribution requirements of § 11.30, they lack sufficient importance to justify the more burdensome reporting requirements of § 11.23. Again, while referendum questions may often appear on the same ballot as candidate elections, they are fundamentally different. The public's interest in knowing the source of political money and how it is spent is substantially diminished in the context of § 11.23. As the Supreme Court noted, "the direct participation of the people in a referendum" should not invite "greater restriction of speech." *Bellotti*, 435 U.S. at 792 n.29 (citations omitted). If anything, it "increases the need for the 'widest possible dissemination of information from diverse and antagonistic sources.'" *Id*. (citations omitted).

This Court agrees with *Swaffer* that "[t]he government's interest in keeping the public informed of where and how the teetotalers of Whitewater are spending their money

- 36 -

to rally support against a liquor referendum is not commensurate with the government's interest in knowing which candidates for public office those same teetotaler financially support." 610 F. Supp. 2d at 968. Moreover, "'[a]s a matter of common sense, the value of this *financial* information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level,'" such as what would be spent by Hatchett or others in similar positions. *See Sampson v. Buescher*, 625 F.3d 1247, 1260 (10th Cir. 2010) (citing *Canyon Ferry Baptist Church of East Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1033 (9th Cir. 2009)) (emphasis in original).

Even if Hatchett spends $1,000 on the next referendum, his expenditure would be sufficiently small which in turn would provide little information about his financial interest on a given issue. *See id.* While states surely have the "leeway to protect the integrity and reliability of the [election] process," the First Amendment requires courts to be vigilant in guarding against "undue hindrances to political conversation and the exchange of ideas." *Buckley*, 525 U.S. at 191-92 (citations omitted).

Other federal courts have examined similar statutes under exacting scrutiny. The Tenth Circuit's recent *Sampson* decision is particularly persuasive. In *Sampson*, 625 F.3d at 1249-51, the court was confronted with a reporting ("disclosure") statute materially similar to § 11.23.

When assessing the same informational interests, the court expressed much doubt about the efficacy of such an interest:

> It is not obvious that there is such a public interest. Candidate elections are, by definition, ad hominem affairs. The voter must evaluate a human being, deciding what the candidate's personal

- 37 -

beliefs are and what influences are likely to be brought to bear when he or she must decide on the advisability of future governmental action. The identities of those with strong financial ties to the candidate are important data in that evaluation. In contrast, when a ballot issue is before the voter, the choice is whether to approve or disapprove of discrete governmental action, such as annexing a territory, floating a bond, or amending a statute. No human being is being evaluated. When many complain about the deterioration of public discourse – in particular, the inability or unwillingness of citizens to listen to proposals made by particular people or by members of particular groups – one could wonder about the utility of ad hominem arguments in evaluating ballot issues. Nondisclosure could require the debate to actually be about the merits of the proposition on the ballot. Indeed, the Supreme Court has recognized that "[a]nonymity . . . provides a way for a writer who may be personally unpopular to ensure that readers will not prejudge her message simply because they do not like its proponent."

*Id.* at 1256-57 (quoting *McIntyre*, 514 U.S. at 342). In short, *Sampson* found a poor relationship between any informational interest and the expenditure of $782.02 in that case – an amount nearly identical to the new "trigger" under § 11.23. This Court agrees.

Moreover, *Sampson's* assessment is consistent with relevant Supreme Court precedent. While the Supreme Court has spoke favorably of such reporting requirements, it has done so only in *dicta* and only on three occasions, and it has never rejected a First Amendment challenge to a financial-reporting requirement in the ballot-issue context. *See Bellotti*, 435 U.S. at 790-92; *City of Berkeley*, 454 U.S. at 299-300; *Buckley*, 525 U.S. at 202-03.

In sum, even under the more lenient exacting scrutiny standard, § 11.23 of the Wisconsin Statutes fails to pass constitutional muster. Accordingly, this Court concludes that § 11.23 is unconstitutional, as applied to Hatchett's case. In so holding, this Court declines to suggest a bright line rule below which Hatchett cannot be required to report

- 38 -

contributions and expenditures. However, the instant case is far different than those involving the expenditure of tens of millions of dollars on ballot issues presenting complex policy proposals. Today, this Court simply holds that the new threshold remains well below the line.

*D. The Remedy*

Having found that both §§ 11.30 and 11.23 unconstitutional as applied to Hatchett, this Court addresses his requests for a permanent injunction, and declaratory judgment that the statutes are facially unconstitutional.

To obtain permanent injunctive relief, a plaintiff must satisfy the following four factors: (1) that he has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Addressing the first factor, Hatchett has clearly suffered an irreparable injury. The Supreme Court as well as the Court of Appeals for the Seventh Circuit have emphasized that "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (citation omitted); *see also Dombrowski v. Pfister*, 380 U.S. 479, 485-86 (1965) (holding that an allegation of impairment to freedom of expression demonstrated an irreparable injury); *Joelner v. Vill. of Wash. Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) (quoting *Elrod*, 427 U.S. at 373); *Citizens for a Better Env't v. City of Park Ridge*, 567 F.2d 689, 691 (7th Cir. 1975) (holding that even a "temporary deprivation" of First Amendment rights constitutes

- 39 -

irreparable harm); *Schnell v. City of Chicago*, 407 F.2d 1084, 1086 (7th Cir. 1969) ("The presumption of irreparable harm is manifest . . . when it is alleged that first amendment rights have been chilled . . . .") Here, Hatchett suffered the loss of his First Amendment freedoms to engage in political speech prior to obtaining a preliminary injunction from this Court, which is sufficient to establish irreparable harm.

With respect to the second factor, Hatchett has inadequate remedies at law; monetary damages cannot replace the loss of protected First Amendment rights, even if those losses were temporary. *See Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) ("[I]njunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages"); *see also Flower Cab. Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982) ("In [First Amendment] cases the quantification of injury is difficult and damages are therefore not an adequate remedy.").

Regarding the third factor, a permanent injunction is warranted upon consideration of the hardship to Hatchett and the Defendants. The GAB has voluntarily instructed both its staff and all Wisconsin district attorneys not to enforce the laws against Hatchett or others like him and there is no evidence that not enforcing the laws is causing hardship to the Defendants. There is also no indication that a permanent injunction would operate differently.

On the other hand, while Hatchett has such reassurances, they do not have the force or effect of law. Because such statements do not have the force or effect of law, they do not prevent subsequent enforcement of the statutes, and Hatchett will have to suppress his speech or again seek legal relief if he wants the complete assurance that his actions will not lead to penalties. Hatchett should not be forced to rely on the government's mere promises.

- 40 -

*See Stevens*, 130 S.Ct. at 1591 ("[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."). The very fact that a case raises serious First Amendment questions compels a finding that there exists the potential for irreparable injury, or that at the very least the balance of hardships tips sharply in a plaintiff's favor. *See Elrod*, 427 U.S. at 373; *Joelner*, 378 F.3d at 620; *see also Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 973 (9th Cir. 2002). Thus, the third element of the standard is satisfied.

Addressing the fourth factor, the public interest will not be disserved by the grant of a permanent injunction. The statutes still remain enforceable. As consequence, Hatchett will continue to be harmed since he may, because of that enforceability, choose not to participate in this type of political advocacy. Again, because the law remains on the books notwithstanding the GAB's nonenforcement statements, Hatchett will have to suppress his speech or continue to seek legal relief if he wants the complete assurance that his actions will not lead to penalties. This is at direct odds with the Supreme Court's repeated statements that public discourse, especially on matters of political concern, should be "uninhibited, robust, and wide-open." *Buckley*, 424 U.S. at 14 (quoting *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964)). Indeed, a permanent injunction would greatly serve the public interest by providing a valuable opportunity for Hatchett to engage in such speech without hesitation or restraint. As such, all four factors of the test are met, and therefore, Hatchett's request for a permanent injunction enjoining the Defendants from enforcing §§ 11.23 and 11.30 of the Wisconsin Statutes and Wis. Admin. Code GAB § 1.655 is granted.

Hatchett also requests declaratory judgment that §§ 11.30 and 11.23 are

- 41 -

facially unconstitutional. In order for Hatchett to obtain such declaratory relief, he has a considerable burden to overcome. On multiple occasions, the Supreme Court has strongly admonished district courts to adjudicate the merits of as-applied challenges before reaching facial ones, and this rule has also been reinforced by multiple Seventh Circuit decisions. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 45051- (2008) (explaining that "facial challenges are disfavored for several reasons"); *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006) ("[T]he 'normal rule' is that 'partial, rather than facial, invalidation is the required course,' such that a 'statute may . . . be declared invalid to the extent that it reaches too far, but otherwise left intact.'" (citation omitted)); *see also Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 683 (7th Cir. 1998) (warning that courts should be "mindful of the Supreme Court's strong admonition that a court should adjudicate the merits of an as-applied challenge before reaching a facial challenge to the same statute," and that if the plaintiff "succeeds on its as-applied challenge, the district court should not conduct further proceedings concerning the facial challenge."); *Doe v. Heck*, 327 F.3d 492, 527-28 (7th Cir. 2003) (holding that courts should exercise judicial restraint and decide as-applied challenges before facial challenges). Therefore, if a plaintiff succeeds on an as-applied challenge, as Hatchett has done, the district court need not consider a facial challenge. *Commodity Trend Serv.*, 149 F.3d at 683.

Furthermore, *Swaffer* declined to decide the merits of facial challenges to the same statutes after concluding that the plaintiffs succeeded on their as-applied challenges. Relying on the precedents above, the district court opined:

Because of the relatively unsettled and evolving nature of First

- 42 -

> Amendment jurisprudence in the area of campaign finance laws, and because it appears that the Wisconsin Supreme Court has not addressed the scope of these statutory provisions, the court declines to reach the issue of whether §§ 11.23 and 11.30 are unconstitutional on their face.

*Swaffer*, 610 F. Supp. 2d at 971 (citations omitted).

Hatchett contends that the jurisprudence in this area is no longer unclear, and that Wisconsin's attempt to remedy the statute by increasing the monetary trigger was ineffective. He also cites portions of *Citizens United* declaring provisions of the BCRA facially unconstitutional although the plaintiff had abandoned its facial challenge.

*Citizens United* determined that facial invalidation was required because of the "primary importance of speech to the integrity of the election process," the uncertainty created by the government's litigating position, and because of the substantial time and burdens required to clarify the law through multiple as-applied challenges. *Citizens United*, 130 S.Ct. at 895. The Supreme Court emphasized that a "speaker's ability to engage in political speech that could have a chance of persuading voters is stifled if the speaker must first commence a protracted lawsuit." *Id.* Therefore, the Supreme Court concluded that the "ongoing chill upon speech that is beyond all doubt protected makes it necessary in this case to invoke the earlier precedents that a statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated." *Id.* at 896.

*Citizens United* has not completely eliminated the uncertainty highlighted by *Swaffer*. If anything, it added more confusion, as it is seemingly in direct conflict with the Supreme Court's prior admonitions of facial invalidation. Indeed, four Justices dissented in this regard:

> This Court has repeatedly emphasized in recent years that

- 43 -

> "[f]acial challenges are disfavored." . . . By declaring 203
> facially unconstitutional, our colleagues have turned an as-
> applied challenge into a facial challenge, in defiance of this
> principle.
>
> This is not merely a technical defect in the Court's decision.
> The unnecessary resort to a facial inquiry "run[s] contrary to the
> fundamental principle of judicial restraint that courts should
> neither anticipate a question of constitutional law in advance of
> the necessity of deciding it nor formulate a rule of constitutional
> law that is broader than is required by the precise facts to which
> it is to be applied. Scanting that principle "threaten[s] to short
> circuit the democratic process by preventing law embodying the
> will of the people from being implemented in a manner
> consistent with the Constitution."

*Id.* at 932-33 (Stevens, J., dissenting) (citations omitted). The foregoing dissent indicates

that, contrary to Hatchett's position, this is not a well-settled doctrine. Moreover, while the

majority reverted back to the Supreme Court's older holdings, the majority never explicitly

overruled its more recent precedent. Consequently, because the uncertainty in this area has

escalated with the *Citizens United* decision, this Court declines to declare the statutes facially

unconstitutional. *See also, Swaffer*, 610 F. Supp. 2d at 971. The area of campaign finance

reform law remains too unsettled for this Court to facially invalidate these statutes. *Id.*

Furthermore, even if *Citizens United* would have affirmatively overruled the

Supreme Court's prior warnings about facial invalidation, this Court would hesitate to

declare §§ 11.23 and 11.30 facially unconstitutional. Facial invalidation is only appropriate

"when the overbreadth of the statute is not only 'real, but substantial as well, judged in

relation to the statute's plainly legitimate sweep,' and when the statute is not susceptible to

limitation or partial invalidation." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 411-12 (1992)

(White, J., concurring) (citations omitted). In determining whether statutory provisions are

facially overbroad or vague, the Court must find that the provisions reach a substantial

amount of constitutionally protected conduct. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 494-95 (1982). However, "[c]laims of facial invalidation often rest on speculation," and consequently "raise the risk of premature interpretation of statutes on the basis of factually barebones records." *Wash. State Grange*, 552 U.S. at 450; *see also Sabri v. United States*, 541 U.S. 600, 609 (2004). Additionally, they are contrary to "the fundamental doctrine of judicial restraint," and "threaten to short circuit the democratic processes by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 450-51.

In this case, Hatchett has proffered little evidence of how §§ 11.23 and 11.30 actually affect any other individual or entity. Without a proper showing that there are virtually no circumstances in which the statues could be applied constitutionally, the Court would be wary of reaching a facial challenge. With such an incomplete and unsatisfactory record, the Court would be forced to facially invalidate the statutes based on pure speculation – contrary to the Supreme Court's strong advice against taking such a risk. *See id*. at 450.

In sum, while the Court concludes that §§ 11.23 and 11.30 are unconstitutional as-applied against Hatchett, and that Hatchett has met his burden in obtaining permanent injunctive relief, the Court declines to declare the statutes facially unconstitutional, not only because of the rather undeveloped record, but also because of the "relatively unsettled and evolving nature of First Amendment jurisprudence in the area of campaign finance laws." *See Swaffer*, 610 F. Supp. 2d at 971.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY**

- 45 -

**ORDERED THAT**:

Pursuant to Fed. R. Civ. P. 25(d), Eich and Myse are **DISMISSED** from this action, and Deininger and Voeke, in their official capacities as members of the GAB, are **SUBSTITUTED** as Defendants in this action. The caption is further amended to reflect that Barland and Nichol have assumed the positions of the GAB Chair and Vice Chair, respectively;

Hatchett's motion for summary judgment (Docket No. 40) is **GRANTED**, to the following extent, it is hereby **DECLARED** that Wis. Stat. §§ 11.23 and 11.30 and Wis. Admin. Code [GAB] § 1.655 are unconstitutional as applied to Hatchett and the Defendants are **PERMANENTLY ENJOINED FROM ENFORCING** Wis. Stat. §§ 11.23 and 11.30 and Wis. Admin. Code GAB § 1.655;

The Defendants' motion for summary judgment (Docket No. 37) is **DENIED**;

This action is **TERMINATED**; and,

The Clerk of Court is **DIRECTED** to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 14th day of September, 2011.

**BY THE COURT**:

*Rudolph T. Randa*

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**